[Cite as *Stewart v. Bear's Tire*, 2019-Ohio-1832.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

| | | |
|---|---|---|
| LARRY R. STEWART, JR., | : | CASE NO. CA2018-08-162 |
| Appellee, | : | O P I N I O N<br>5/13/2019 |
| | : | |
| - vs - | : | |
| | : | |
| BEAR'S TIRE, | : | |
| Defendant, | : | |
| and | : | |
| SARAH D. MORRISON,<br>ADMINISTRATOR, OHIO BUREAU OF<br>WORKERS' COMPENSATION, | : | |
| | : | |
| Appellant. | : | |

CIVIL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CV2017-02-0401

Honerlaw Law Office, LLC, Michael J. Honerlaw, 7770 West Chester Road, Suite 200, West Chester, Ohio 45069, for appellee

Dave Yost, Ohio Attorney General, Barbara L. Barber, Principal Assistant Attorney General, 1600 Carew Tower, 441 Vine Street, Cincinnati, Ohio 45202, for appellant

**M. POWELL, J.**

{¶ 1} Appellant, the Ohio Bureau of Workers' Compensation ("BWC"), appeals the

decision of the Butler County Court of Common Pleas, which found appellee Larry R. Stewart, Jr. entitled to participate in the workers' compensation fund. For the reasons discussed below, this court affirms the trial court's decision.

{¶ 2} In 1979, Stewart founded the business that would eventually become Bear's Tire, Inc. ("Bear's"). The business provided mobile commercial-vehicle tire changing services in southwest Ohio. In 2009, Bear's had three employees: Stewart, Chuck King, and John Dillon. Stewart was the company president and worked from his home office managing the company's finances, billing, and customer relations. King and Dillon were both commercial tire changers who worked in the field. King and Dillon drove Bear's service trucks and responded to service calls. Contemporaneously, Stewart was also the sole member of "Larry Stewart, LLC." Larry Stewart, LLC owned several multi-unit apartment buildings in Cincinnati.

{¶ 3} On the morning of Wednesday, February 18, 2009, Stewart arranged for Dillon to meet him at a Bob Evans restaurant. Stewart left his home and was driving southbound on Interstate 75 towards the restaurant when a vehicle driving the opposite direction crashed head-on into Stewart's vehicle.

{¶ 4} Stewart later submitted a claim for benefits to the BWC and asserted that he was working for Bear's at the time of the accident. The BWC approved Stewart's claim for a variety of medical conditions.

{¶ 5} Stewart sued the wrong-way driver. During his deposition in that case, Stewart stated that he was driving to meet Dillon to take Dillon to work at the Larry Stewart, LLC apartments because Bear's business had been slow. A BWC representative was present at this deposition. Stewart's testimony apparently led BWC to conclude that Stewart had defrauded the fund by applying for workers' compensation benefits because, while

Bear's had workers' compensation coverage for its employees, Larry Stewart, LLC did not.[1]

{¶ 6} In 2014, BWC moved the Industrial Commission to vacate the approval of Stewart's workers' compensation claim and declare an overpayment based on alleged civil fraud. An Industrial Commission staff hearing officer agreed with the BWC, finding that the accident was not related to Stewart's employment with Bear's and was only related to Larry Stewart, LLC. The hearing officer concluded that Stewart's failure to inform the BWC that he was driving to meet Dillon with the intention of taking Dillon to work at the Larry Stewart, LLC apartments was civil fraud. Based upon this finding, the hearing officer declared an overpayment for the workers' compensation benefits received by Stewart. Stewart appealed to the Butler County Common Pleas Court.

{¶ 7} In August 2017, the parties held a bench trial limited to the determination of whether Stewart's injuries were "received in the course of" and "arose out of" his Bear's employment.[2] Stewart testified as did Dillon, King, and other former Bear's employees. The evidence revealed that Stewart was both an owner and a wage-earning employee of Bear's. Stewart worked out of his home office mainly doing paperwork. Chuck King handled dispatch and would also go on service calls as needed. John Dillon performed service calls.

{¶ 8} The company rented storage units located near Interstate 75 where the company stored truck tires and other supplies. King or Dillon could stop by the storage unit as necessary and pick up tires or other equipment for service calls.

{¶ 9} Bear's was generally busy in spring and summer and there was plenty of work to ensure that Bear's employees worked a 40-hour week. However, during the winter

---

1. Evidence at trial indicated that Larry Stewart, LLC never had an employee prior to the date of Stewart's accident.

2. The trial was bifurcated; the first trial would determine if Stewart's injuries were received in the course of and arose from his Bear's employment and the second trial, if necessary, would determine the medical conditions causally related to the accident.

months business was slow because there were fewer tire blow-outs in the cold weather. During these slow times, Stewart would occasionally direct his Bear's service employees, like King and Dillon, to perform various tasks at the Larry Stewart, LLC apartments. These tasks included shoveling snow, raking leaves, and turning over apartments for re-letting. King, Dillon, and other former employees who testified all agreed that they were always paid for their work at the apartments by Bear's and never received a paycheck from Larry Stewart, LLC.

{¶ 10} On the morning of February 18, 2009, Bear's business was slow. Dillon was on the road in his service truck headed to the storage unit when he received a call, either from Stewart or King, directing him to meet Stewart at a Bob Evans restaurant. He proceeded to the restaurant and waited in his truck for Stewart to arrive. Meanwhile, Stewart left his home in his personal car, which had some maintenance tools in it for work at the apartments.

{¶ 11} Dillon was unaware of the purpose for the meeting at Bob Evans but understood he was going to meet both Stewart and King there. He anticipated that Stewart would buy them breakfast. Stewart had previously taken him and King out to lunch before and would ask them about their days.

{¶ 12} Stewart, in fact, intended to instruct Dillon to work at the apartments that day. However, he hoped that he could "kill an hour" at breakfast during which there might be a call for tire service. It was undisputed that tire service calls always received priority over any work at the apartments. For instance, if a tire service call was received while an employee was working at the apartments, the employee would cease working and respond to the tire service call. Bear's had a reputation for its fast response to service calls.

{¶ 13} Stewart estimated it would take two to three years for a commercial tire changer to become proficient and there were significant costs involved in training new

employees for the job. Stewart also guaranteed those employees who worked for Bear's in the winter that they would have full-time employment. Multiple former Bear's employees testified that it was important that they have full-time employment with Bear's and that if Bear's would not have provided full wages they would have looked for work elsewhere.

{¶ 14} The trial court concluded that Stewart's injury was "received in the course of" and "arose out of" his employment with Bear's. The court found that Stewart "scheduled and travelled to the breakfast with the intention to boost morale, discuss company business, and to buy time in hope that tire service calls would be received." The court also found that Stewart's actions were in furtherance of Bear's business because Stewart was ensuring that Dillon, a highly-trained employee, maintained a 40-hour work week during Bear's slow season and that retaining Dillon was a benefit to Bear's.

{¶ 15} In the second phase of the trial, in April 2018, the parties submitted evidence to the court on the issue of what medical conditions were causally related to the vehicle accident. Through a perpetuation deposition, Stewart introduced the expert testimony of Dr. Thomas Forte, who had reviewed Stewart's medical treatment records and opined that Stewart's numerous medical diagnoses were causally related to the accident. BWC submitted no contrary expert medical opinion. Instead, the BWC argued that certain medical records contradicted Dr. Forte's opinion. Ultimately, the court found that Stewart was entitled to participate in the workers' compensation fund for his injuries.

{¶ 16} BWC appeals, raising six assignments of error. This court will address the first five assignments of error collectively.

{¶ 17} Assignment of Error No. 1:

{¶ 18} THE TRIAL COURT'S JUDGMENT THAT LARRY STEWART'S FEBRUARY 18, 2009 TRAFFIC ACCIDENT WAS "IN THE COURSE OF" EMPLOYMENT WITH BEAR'S TIRE IS (1) NOT SUPPORTED BY SUFFICIENT EVIDENCE, AND (2) IS

AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, PREJUDICING DEFENDANT ADMINISTRATOR.

{¶ 19} Assignment of Error No. 2:

{¶ 20} AS A MATTER OF LAW, THE TRIAL COURT ERRED IN RULING THAT LARRY STEWART'S FEBRUARY 18, 2009 TRAFFIC ACCIDENT OCCURRED "IN THE COURSE OF" EMPLOYMENT WITH BEAR'S TIRE.

{¶ 21} Assignment of Error No. 3:

{¶ 22} THE TRIAL COURT'S JUDGMENT THAT LARRY STEWART'S FEBRUARY 18, 2009 TRAFFIC ACCIDENT "ARIS[ES] OUT OF" EMPLOYMENT WITH BEAR'S TIRE IS (1) NOT SUPPORTED BY SUFFICIENT EVIDENCE, AND (2) IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, PREJUDICING DEFENDANT ADMINISTRATOR.

{¶ 23} Assignment of Error No. 4:

{¶ 24} AS A MATTER OF LAW, THE TRIAL COURT ERRED IN RULING THAT LARRY STEWART'S FEBRUARY 18, 2009 TRAFFIC ACCIDENT "ARIS[ES] OUT OF" EMPLOYMENT WITH BEAR'S TIRE.

{¶ 25} Assignment of Error No. 5:

{¶ 26} WHEN THE TRIAL COURT ALTERNATIVELY RULED THAT LARRY STEWART'S 2009 TRAFFIC ACCIDENT WAS CAUSED BY HIS BEAR'S EMPLOYMENT BECAUSE STEWART WAS "POSSIBLY" TAKING JOHN DILLON, A BEAR'S TIRE EMPLOYEE, TO WORK AT STEWART'S PRIVATE RENTAL PROPERTY, THE TRIAL COURT UNLAWFULLY DISREGARDED THE DISTINCTION BETWEEN STEWART, THE PERSON, AND BEAR'S THE CORPORATION, WHICH PREJUDICED DEFENDANT ADMINISTRATOR.

{¶ 27} In its first five assignments of error, BWC presents numerous and varied

arguments challenging the legal conclusions and factual findings underpinning the trial court's decision that Stewart received injuries "in the course of" his employment with Bear's and that those injuries "arose out of" that employment. This court reviews evidentiary challenges to a trial court's decision concerning an employee's right to participate in the worker's compensation fund under the manifest weight of the evidence standard. *Hornschemeier v. Buehrer*, 12th Dist. Clermont No. CA2016-11-079, 2017-Ohio-7021, ¶ 15. A manifest weight challenge concerns the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 12. In a manifest weight analysis, the reviewing court weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. *Id.* at ¶ 20.

{¶ 28} The Workers' Compensation Act defines a compensable "injury" as "any injury, whether caused by external accidental means or accidental in character and result, *received in the course of, and arising out of*, the injured employee's employment." (Emphasis added.) R.C. 4123.01(C). To establish the right to participate in the workers' compensation fund, an injured employee must show, by a preponderance of the evidence, both that the injury was received in the course of and arose out of employment and that a proximate causal relationship existed between the injury and the harm or disability. *Bennett v. Admr., Ohio Bur. of Workers' Comp.*, 134 Ohio St.3d 329, 2012-Ohio-5639, ¶ 18.

{¶ 29} To determine if a worker's injury was "received in the course of" employment requires an examination of the "time, place and circumstances of the injury * * *." *Fisher v. Mayfield*, 49 Ohio St.3d 275, 277 (1990). Whether an injury "arose out of" employment refers to the causal connection between the employment and the injury. *Id.* "Whether there

- 7 -

is a sufficient 'causal connection' between an employee's injury and his employment * * * depends on the totality of the facts and circumstances surrounding the injury, including, (1) the proximity of the scene of the accident to the place of employment, (2) the degree of control the employer had over the scene of the accident, and (3) the benefit the employer received from the injured employee's presence at the scene of the accident." *Lord v. Daugherty*, 66 Ohio St.2d 441 (1981), at the syllabus. The Ohio Supreme Court has cautioned that:

> workers' compensation cases are, to a large extent, very fact specific. As such, no one test or analysis can be said to apply to each and every factual possibility. Nor can only one factor be considered controlling. Rather, a flexible and analytically sound approach to these cases is preferable. Otherwise, the application of hard and fast rules can lead to unsound and unfair results.

*Fisher* at 280.

{¶ 30} In applying the foregoing, the Ohio Supreme Court has further held that "'workers' compensation statutes must be liberally construed in favor of the employee. * * *. Thus, it is axiomatic that the phrase 'in the course of, and arising out of' must be accorded a liberal construction. In applying it [the coverage formula], this court must be guided by the * * * fundamental principle that the requirement is to be liberally construed *in favor of awarding benefits.*'" (Internal citations omitted.) (Emphasis sic.) *Id.* at 278, quoting *Maher v. Workers' Comp. Appeals Bd.*, 33 Cal.3d 729, 733 (Cal.1983).

{¶ 31} Concerning the "received in the course of" requirement, the evidence revealed that the vehicle accident occurred at approximately 7:30 a.m., on a workday, during Stewart's normal working hours. The accident took place on an interstate highway, away from any Bear's location. The accident happened while Stewart was traveling from his Bear's home office to meet with at least one Bear's employee, Dillon. Stewart was driving to meet Dillon because he intended for Dillon to work at the apartments owned by

Larry Stewart, LLC if no service calls came in for Bear's in the interim.

{¶ 32} With respect to the "arising out of" requirement, the evidence indicated that the accident was not proximate to Bear's storage facilities, Stewart's home office or to a roadside service call. Bear's also had no control over the scene of the accident. Thus, the first two *Lord* factors, while not negating, do not support a finding that Stewart's injuries "arose out of" his Bear's employment.

{¶ 33} The third *Lord* factor concerns whether the employer benefitted from the employee's presence at the scene of the accident. In this regard, the evidence at trial indicated the accident occurred while Stewart was travelling to a breakfast meeting he partially intended as an employee morale booster. Dillon testified that he anticipated that Stewart might buy him breakfast as Stewart had previously bought him and King lunch at Frisch's as a friendly gesture and that he would ask about how their days were going. Stewart also hoped that the breakfast would take enough time that a Bear's tire service call would come in and he could send Dillon on a service call as opposed to doing busy work at the apartments.

{¶ 34} The evidence also indicated that Stewart was travelling to meet Dillon to give him work. It was important to Dillon and other Bear's employees to make full-time wages in the winter months when Bear's business was slow. These employees testified that Stewart would occasionally direct them to work at the apartments and that they would have looked for work elsewhere had Bear's not provided full-time wages. Stewart testified that it took two to three years and considerable expense to fully train a commercial tire changer. Thus, there was a benefit to Bear's in finding work for its highly trained employees in slow months to retain those employees. And Bear's also always paid for its employees' work at the apartments. Bear's benefitted from this arrangement despite the concurrent benefit enjoyed by Larry Stewart, LLC.

{¶ 35} Construing the statute liberally in Stewart's favor, cognizant that no one factor is controlling and applying the *Fisher* rule that the factors be adapted to each case in a fact-specific manner, this court concludes that substantial evidence supported the trial court's conclusion that Stewart's injuries were received in the course of and arose out of his employment with Bear's. Therefore, the trial court did not clearly lose its way. This court's conclusion is also dispositive of the BWC's separate arguments alleging that the trial court's findings were not supported by sufficient evidence.

{¶ 36} BWC's appellate brief contains numerous sub-arguments challenging various other aspects of the trial court's decision. In its first assignment of error, BWC contends that the court improperly stacked inferences when it found that found that Stewart intended to meet with Dillon at Bob Evans, have a morale-boosting breakfast, and discuss Bear's business. Though denounced by both courts and commentators, the rule prohibiting the stacking of one inference upon another is still recognized in Ohio. *Donaldson v. N. Trading Co.*, 82 Ohio App.3d 476, 481 (10th Dist.1992), citing *Motorists Mut. Ins. Co. v. Hamilton Twp. Trustees*, 28 Ohio St.3d 13 (1986). "The rule has very limited application. It prohibits only the drawing of one inference solely and entirely from another inference, where that inference is unsupported by any additional facts or inferences drawn from other facts." *Id.*, citing *Hurt v. Charles J. Rogers Transp.* Co., 164 Ohio St. 329 (1955), paragraph one of the syllabus. "Because reasonable inferences drawn from the evidence are an essential element of the deductive reasoning process by which most successful claims are proven, the rule against stacking inferences must be strictly limited to inferences drawn exclusively from other inferences." *Id.*

{¶ 37} The trial court did not stack inferences. Stewart testified that he told Dillon to meet him at Bob Evans and that Dillon was "on the clock" for Bear's as soon as he directed him to meet him there. Regarding what he intended to do at Bob Evans, Stewart stated:

"[i]f I felt fit that if I could have killed an hour there, then I would have killed an hour there hopefully with luck of getting a service call sometimes you gotta take that shot." In other words, Stewart hoped that during the time he was having breakfast with Dillon, a Bear's service call would come in and Dillon could take that call in lieu of working at the apartments. However, if no call came, then Stewart intended to have Dillon work at the apartments so that Dillon could get his work hours. Dillon testified that he was unaware that Stewart would be directing him to work at the apartments that day but assumed that Stewart was going to buy him breakfast. Stewart had previously taken Dillon and King out to Frisch's for lunch. In Dillon's words, Stewart was "[j]ust being real nice and buying lunch for us … talking about how our day went." Accordingly, the trial court's findings regarding the breakfast meeting were based upon direct evidence or reasonable, common sense inferences derived from the evidence. This argument is meritless.

{¶ 38} In both its second and third assignments of error, BWC argues that Stewart was not acting as a Bear's employee at the time of the accident because he was on a "purely personal mission" when the accident occurred. In support of this argument, BWC cites two cases where an employee who was driving a vehicle on a personal errand was found to be ineligible to participate in the workers' compensation fund. *Oberhauser v. Mabe*, 12th Dist. Butler No. CA2008-11-266, 2009-Ohio-3680 and *Cardwell v. Indus. Comm.*, 155 Ohio St. 466 (1951). In *Oberhauser*, a school teacher was killed while traveling to a teaching workshop on a Saturday. *Id.* at ¶ 2. Her employer had not directed her to attend the workshop and had no knowledge of her intention to attend. *Id.* But the workshop provided a means by which the teacher could maintain her certificate to continue teaching. *Id.* at ¶ 26. This court held that the purpose of the teacher's travel was "primarily personal" because it was to further her own interest in maintaining her ability to teach and that while her employer, the school district, may have "indirectly benefitted," the primary benefit was

- 11 -

for her career. *Id.* at ¶ 27.

{¶ 39} In *Cardwell*, an employee left his home on a Sunday for a "strictly personal" trip. *Id.* at 466. He was injured while travelling in a direction back towards his home. *Id.* at 467. However, the worker alleged that his employer required him to travel to the employer's parking lot each evening to turn on the lights and he was traveling to the parking lot at the time of the injury. *Id.* The court noted that the accident occurred while the employee was on a route that would appear to first take him to back to his home before continuing to the employer's parking lot. *Id.* at 467-468. Thus, the court found that the trip was personal and could not be shown to have been employer-related, at least until the worker had either arrived at his home or passed his home on the way to the parking lot. *Id.* at 468.

{¶ 40} These cases are distinguishable. Unlike in *Oberhauser*, Stewart's actions were known and sanctioned by the company, who paid for its employees' occasional work at the apartments and derived a benefit from retaining its highly trained employees during times of slow business. *Cardwell* is distinguishable as Stewart's purpose for being on the road was not personal but was for purposes of meeting with Dillon in furtherance of Bear's business for the reasons already stated. Accordingly, the arguments presented in the second and third assignments of error lack merit.

{¶ 41} In the fourth assignment of error, BWC challenges the causal connection between Stewart's injury and his employment with Bear's by arguing that he was in a personal vehicle when the injury occurred, he was not at Bear's home office, and he ultimately intended to travel to a rental property owned by Larry Stewart, LLC. These are facts that the trial court would necessarily consider when assessing the totality of circumstances. And none of these facts detract from the trial court's conclusion that Stewart's actions were a benefit to and in furtherance of Bear's business. Therefore, this argument is meritless.

{¶ 42} In the fifth assignment of error, BWC argues that the court erred in finding that Stewart was acting as an employee of Bear's at the time of the accident because there was no evidence that Bear's authorized Stewart to direct Bear's employees to work at the apartments. However, at trial, Stewart and Bear's former employees all testified that the practice of sending employees to work at the apartments was an occasional but customary occurrence when work was slow. Stewart was the president of the company at the time of the accident and there is no evidence indicating that he was limited in his ability to direct where Bear's employees should work. Stewart also introduced Bear's corporate records. The records include the minutes of a June 2009 meeting in which Stewart was described as Bear's director. The records reflect that the company board of directors specifically approved all actions taken by the directors since the last stockholders' meeting in June 2008. There is no merit to the argument that Stewart's actions were unauthorized by the company. For the foregoing reasons, this court overrules BWC's first through fifth assignments of error.

{¶ 43} Assignment of Error No. 6:

{¶ 44} DR. THOMAS FORTE OFFERED TESTIMONY ON MEDICAL CONDITIONS ALLEGED BY LARRY STEWART WITHOUT EVER HAVING EXAMINED OR MET LARRY STEWART, AND INSTEAD, SIMPLY CONDUCTED A POLL OF OPINIONS FROM NON-TESTIFYING PHYSICIANS CONTAINED IN STEWART'S CLAIM FILED, WHICH PREJUDICED DEFENDANT ADMINISTRATOR.

{¶ 45} BWC argues that the court erred in admitting the expert medical testimony of Dr. Thomas Forte, who opined that certain diagnoses were causally connected to the injuries suffered by Stewart in the accident. BWC argues that Dr. Forte's testimony was unreliable and inadmissible where he did not personally examine Stewart and based his expert opinion on a review of Stewart's administrative claim file and on the causation

opinions of the doctors who provided Stewart with treatment. However, Stewart argues that Dr. Forte properly based his opinion upon a review of Stewart's medical records.

{¶ 46} The admission or exclusion of relevant evidence is a matter within the sound discretion of the trial court. *Williams v. Parker Hannifin Corp.*, 188 Ohio App.3d 715, 725, 2010-Ohio-1719, ¶ 41 (12th Dist.). This court reviews for an abuse of discretion, which indicates that the court acted arbitrarily, unreasonably, or unconscionably. *State ex rel. Beavercreek Twp. Fiscal Officer v. Graff*, 154 Ohio St.3d 166, 2018-Ohio-3749, ¶ 23. With respect to the factual basis of an expert witness' opinion, Evid.R. 703 provides that the "facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by the expert or admitted in evidence at the hearing."

{¶ 47} The trial record contains Plaintiff's Exhibit 2, which consists of the documents reviewed by Dr. Forte in rendering his opinion. Many of these documents are Stewart's medical records between 2009 and 2011. At the bench trial, BWC agreed to the admission of Exhibit 2 except for any causation opinions of other doctors contained in those records and any administrative documents, decisions, or related matters from the claim file. The court admitted the document with the qualification that it would consider only the objective medical information and ignore causation opinions. Accordingly, the record contains the medical records upon which Dr. Forte based his expert opinion on medical causation. BWC argues that it is "significant" that Dr. Forte never personally met with Stewart. However, Evid.R. 703 specifically provides that an expert may offer an opinion based upon facts or data admitted into evidence. That Dr. Forte's opinion was based upon a review of Stewart's medical records as opposed to an in-person examination goes to the weight of this evidence, not its admissibility.

{¶ 48} BWC also argues that Dr. Forte's expert opinion was unreliable because he did not render his own expert opinion but instead merely presented the medical causation

opinions of other doctors as his own opinion. There is no support for this argument in the record. Contrary to BWC's argument, Dr. Forte testified that he based his opinion on a "[r]eview of the medical documentation of the treating physicians * * * the objective imaging and laboratory data that was in the file." BWC cites no evidence credibly suggesting that Dr. Forte merely repeated the medical opinions of other doctors in expressing his expert opinion. This court concludes that the trial court did not abuse its discretion in admitting Dr. Forte's testimony and expert opinion. This court overrules BWC's sixth assignment of error.

{¶ 49} Judgment affirmed.

RINGLAND, P.J. and S. POWELL, J., concur.